UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| **CBIZ, INC.** | ) | CASE NO. |
| 5959 Rockside Woods Blvd. N., Suite 600 | ) | |
| Cleveland, Ohio 44131 | ) | JUDGE |
| | ) | |
|   - and - | ) | |
| | ) | |
| **CBIZ BENEFITS & INSURANCE** | ) | |
| **SERVICES, INC.** | ) | |
| 11440 Tomahawk Creek Parkway | ) | |
| Leawood, Kansas 66211 | ) | |
| | ) | |
|   - and - | ) | |
| | ) | |
| **CBIZ INSURANCE SERVICES, INC.** | ) | |
| 44 Baltimore Street | ) | |
| Cumberland, Maryland 21502 | ) | |
| | ) | **VERIFIED COMPLAINT FOR** |
| Plaintiffs, | ) | **TEMPORARY, PRELIMINARY,** |
| | ) | **AND PERMANENT INJUNCTIVE** |
|   v. | ) | **RELIEF, AND COMPENSATORY** |
| | ) | **DAMAGES** |
| **GREGORY J. CRYAN, JERRY KEITH** | ) | |
| **BOWMAN, JR., WILLIAM M. HAYNES,** | ) | |
| **MATTHEW C. McCOUN, PHILLIP R.** | ) | Jury Trial Demanded |
| **LEEK, STEVEN FISCHER** | ) | |
| | ) | |
| ** - and -** | ) | |
| | ) | |
| **EDGEWOOD PARTNERS INSURANCE** | ) | |
| **CENTER d/b/a EPIC INSURANCE** | ) | |
| **BROKERS & CONSULTANTS** | ) | |
| c/o Thomas E. O'Neil | ) | |
| President | | |
| 1140 6th Avenue, 8th Floor | | |
| New York, NY 10036 | | |

Plaintiffs CBIZ, Inc., CBIZ Benefits & Insurance Services, Inc., and CBIZ Insurance

Services, Inc. (collectively "CBIZ"), for their Verified Complaint against Defendants Gregory J.

Cryan, Jerry Keith Bowman, Jr., William M. Haynes, Matthew C. McCoun, Phillip R. Leek,

Steven Fischer, and Edgewood Partners Insurance Center d/b/a EPIC Insurance Brokers and Consultants ("EPIC"), allege and aver as follows:

## INTRODUCTORY STATEMENT

Plaintiff CBIZ, an insurance brokerage, submits this Verified Complaint along with a request for a temporary restraining order and preliminary injunction to enjoin Defendants' ongoing conduct that is irreparably harming CBIZ. Defendants Cryan, Bowman, Haynes, McCoun, Leek, and Fischer (the "Individual Defendants") were employed by CBIZ in various client-facing roles until late May and early June 2024. Most notably, Cryan was CBIZ's Regional President for the Southeastern United States. As a condition of their employment with CBIZ, the Individual Defendants each agreed that they would not use or disclose CBIZ's confidential information and that they would not solicit CBIZ's clients or employees for a period of at least two years following their departure from CBIZ. Cryan is also contractually barred from competing with CBIZ for three years.

Cryan, however, unhappy with the eight figures of compensation he has received from CBIZ since 2012, hatched a scheme with Bowman, Haynes, McCoun, Leek, and Fischer to divert CBIZ clients to Defendant EPIC, a competing insurance brokerage. Upon information and belief, EPIC induced and assisted the Individual Defendants in this scheme. As a result of Defendants' unlawful efforts, CBIZ has already lost 18 clients with business exceeding $2 million to Defendant EPIC since June 10, 2024 alone. Without this Court's immediate intervention to enjoin Defendants from further violating their contractual, common law, and statutory duties to CBIZ, there is no telling how much harm CBIZ will sustain.

## PARTIES

1.      Plaintiff CBIZ, Inc. is a corporation organized under the laws of the State of Delaware, with its principal place of business in Independence, Ohio.

2

2.      Plaintiff CBIZ B&I is a corporation organized under the laws of the State of Missouri, with its principal place of business in Leawood, Kansas.

3.      Plaintiff CBIZ Insurance is a corporation organized under the laws of the State of Maryland, with its principal place of business in Kansas City, Missouri.

4.      Defendant Gregory J. Cryan is, upon information and belief, a citizen of the State of Georgia and was formerly employed by CBIZ as its Regional President for the Southeast.

5.      Defendant Jerry Keith Bowman, Jr. is, upon information and belief, a citizen of the State of Florida and was employed by CBIZ as an insurance producer until he was terminated on May 29, 2024.

6.      Defendant William M. Haynes is, upon information and belief, a citizen of the State of Georgia and was employed by CBIZ as an insurance producer until he was terminated on May 29, 2024.

7.      Defendant Matthew C. McCoun is, upon information and belief, a citizen of the State of Georgia and was employed by CBIZ as a Regional Vice President until he resigned on June 10, 2024.

8.      Defendant Phillip R. Leek is, upon information and belief, a citizen of the State of Georgia and was employed by CBIZ as a Regional Vice President until he resigned on June 10, 2024.

9.      Defendant Steven Fischer is, upon information and belief, a citizen of the State of Florida and was employed remotely by CBIZ as Vice President with direct reporting responsibilities to CBIZ's Alpharetta, Georgia office until he resigned on June 10, 2024.

10.     Defendant Edgewater Partners Insurance Center ("EPIC") is, upon information and belief, a California corporation with its principal place of business at 1 California Street, Suite 400, San Francisco, CA 94111.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this case involves a claim under the federal Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.*, and therefore presents a federal question arising under the laws of the United States.

12.     Additionally, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because complete diversity among the parties exists and the amount in controversy exceeds $75,000, exclusive of interest and costs.

13.     Personal jurisdiction and venue are proper in this Court as to the Individual Defendants because they contractually agreed with CBIZ to "irrevocably submit to the exclusive jurisdiction of the courts in the State of Ohio (state or federal), with venue in Cuyahoga County." *See* Exhibit A, Asset Purchase Agreement Among CBIZ, Inc., CBIZ Benefits & insurance Services, Inc., CBIZ Insurance Services, Inc., Meridian Insurance Group, LLC, Capitol Risk Concepts/Meridian, LLC, and All of the Direct and Indirect Owners of Meridian Insurance Group, LLC (the "Asset Purchase Agreement") at § 8.8; Exhibit B, Cryan Employment Agreement at § 14; Exhibit C, Bowman Employment Agreement at § 12; Exhibit D, Haynes Employment Agreement at § 12; Exhibit E, McCoun Employment Agreement at § 12; Exhibit F, Leek Employment Agreement at § 12; Exhibit G, Fischer Employment Agreement at § 12.

14.     Personal jurisdiction and venue are proper in this Court as to Defendant EPIC because EPIC has knowingly and intentionally directed its tortious conduct toward, and caused tortious injury to, Plaintiff CBIZ, Inc., an Ohio corporation. Further, EPIC maintains a branch location at 6100 Oak Tree Boulevard, Suite 405, Independence, Ohio, and regularly transacts

business in Ohio and derives substantial revenue from services rendered in Ohio within the meaning of Ohio Revised Code § 2307.382(A)(4). This Court's exercise of jurisdiction over EPIC is also consistent with traditional notions of fair play and substantial justice as required by the Due Process Clause of the Fourteenth Amendment.

## FACTUAL BACKGROUND

15.     CBIZ is a national property and casualty insurance broker that offers commercial liability policies, personal lines, program insurance, and risk management services, among other services, for a wide range of industries.

16.     At a high level, CBIZ's business model is predicated on purchasing regional insurance-based companies around the country.

17.     CBIZ integrates the companies it purchases into its national network of insurance-related companies that do business under the CBIZ name.

### CBIZ Purchased Cryan's Businesses For $9 Million In Cash And CBIZ Stock

18.     On or about January 1, 2012, CBIZ purchased Cryan's insurance-based businesses, Meridian Insurance Group, LLC and Capitol Risk Concepts/Meridian, LLC.

19.     As a result of the purchase, CBIZ acquired "all rights, title and interest of [Cryan] in and to [his Businesses], assets, properties, goodwill and rights owned, held or used by [Cryan] of every nature, kind and description, tangible and intangible, wheresoever located and whether or not carried or reflected on [Cryan's Businesses] books and records." Ex. A at § 1.2.

20.     In exchange for Cryan's Businesses, CBIZ paid over $9 million in cash and CBIZ stock over a three-year period following the closing date.  Ex. A at § 1.5.

### As Part of CBIZ's Purchase of Cryan's Businesses, Cryan Agreed to Restrictive Covenants

21.     As part of CBIZ's purchase of Cryan's Businesses, and in exchange for the substantial cash payments and stock awards made to Cryan and others by CBIZ, Cryan agreed to be bound by a number of restrictive covenants set forth in the Asset Purchase Agreement.

22.     Specifically, Section 5.2(c) of the Asset Purchase Agreement provides:

(c)     **Noncompetition**

(i)     During the applicable Restriction Period, no Seller or Owner shall, directly or indirectly (whether individually or as a member or other owner, investor, partner, manager, shareholder, director, officer, employee, consultant, creditor, lender or agent of any Person, other than CBIZ, Buyers or any other Affiliated Company[1]):

(A)     Enter into, engage in, promote, assist (financially or otherwise), or consult with any business, enterprise or activity which competes, or would compete, with the Related Company Business[2] anywhere within a 200-mile radius of an office location of an Affiliated Company;

(B)     Solicit (or attempt to solicit) business patronage from or call on, or conduct business with, render services to, or accept money from, any vendors, any clients or Qualified Prospective Client[3] anywhere in the United States, or interfere (or attempt to interfere) with any relationship or any Affiliated Company with any vendor or client; provided, however, this provision shall not preclude Sellers from soliciting business patronage, calling on or conducting business with, rendering services to or accepting money from any vendor, client, or Qualified Prospective Client, or going to work for any such entity, as long as such solicitation or employment is unrelated to any activity which

---

[1] 'Affiliated Company" means CBIZ, CBIZ B&I, CBIZ Insurance and all subsidiaries and affiliates of CBIZ, CBIZ B&I and CBIZ insurance." *Id*. at § 5.2(c)(ii)(A).

[2] The "'Business'" is defined as "[a]ll of the businesses conducted by [Meridian] in the twelve months prior to the Closing," *Id.* at 1, and "'Related Company Business' means the Business and any other business or businesses conducted or proposed to be conducted by the Employee Services division of CBIZ and its affiliates, including, without limitation, employee benefits, insurance (including property and casualty), human resources, payroll, flexible benefits, COBRA, integrated employee services, retirement plan services, and other specialized employee services." *Id*. at § 5.2(c)(ii)(F).

[3] "Qualified Prospective Client" means any person that (1) is reflected on any Affiliated Company's prospective client mailing list, or (2) is contacted by an Affiliated Company as part of its marketing and sales efforts at any time during the five-year period beginning on the Closing Date." *Id*. at § 5.2(c)(ii)(D).

competes with, or would compete with, any relationship with any Affiliated Company;

        (C)    Induce (or attempt to induce) or encourage any employee, officer, director, member, manager, partner, shareholder, sales representative, agent, vendor, or independent contractor of any Affiliated Company to terminate its relationship with such Affiliated Company, or otherwise interfere or attempt to interfere in any way with any Affiliated Company's relationships with its employees, officers, directors, members, managers, partners, shareholders, sales representatives, agents, vendors, independent contractors, or others;

        (D)    Employ or engage any Person who, at any time within the twelve month period immediately preceding such employment or engagement, was an officer, director, partner, manager, member, shareholder, sales representative, agent, vendor, or independent contractor of any Affiliated Company;

        (E)    Take any other action that would impair the value of the Business or the assets of any Affiliated Company, including, without limitation, any action that would tend to disparage or diminish the reputation of any Affiliated Company.

Ex. A at § 5.2(c)(i)(A)–(E).

23.    For the purposes of Section 5.2(c)(i), Cryan is defined as an "Owner."  Ex. A at 1.

24.    With regard to the duration of Cryan's restrictive covenants, the Asset Purchase Agreement provides:

For Majority Owner, the period commencing on the Close Date and continuing (i) for three (3) years after the date on which Majority Owner's employment with any Affiliated Company is terminated (for any reason or no reason whatsoever) with respect to the covenant set forth in Subsection 5.2(c)(i)(A), and (ii) for five (5) years after the date on which Majority Owner's employment with any Affiliated Company is terminated (for any reason or no reason whatsoever) with respect to the covenants set forth in Subsections 5.2(c)(i)(B)-(E).

Ex. A at § 5.2(c)(ii)(E) (emphases added).

25.    For the purposes of Section 5.2(c)(ii), Cryan is defined as the "Majority Owner."

*Id.* at § 5.2(c)(ii)(B).

26.     Simply stated, Cryan's covenant not to compete with CBIZ or its affiliated companies, which is set forth in Section 5.2(c)(i)(A) of the Asset Purchase Agreement, lasts for three years after Cryan's employment with CBIZ is terminated (for any reason or no reason), *id.* at § 5.2(c)(ii)(E), and the remainder of Cryan's restrictive covenants, which are set forth in Sections 5.2(c)(i)(B)–(E) of the Asset Purchase Agreement, last for five years after Cryan's employment with CBIZ is terminated by either CBIZ or Cryan.

27.     In the Asset Purchase Agreement, Cryan agreed that he "had an opportunity to seek advice of counsel in connection with" the Asset Purchase Agreement and that the restrictive covenants "contained in [] Section 5.2(c) are reasonable in geographical and temporal scope and in all other respects." Ex A. at § 5.2(c)(vi).

28.     Cryan also agreed that "the provisions of th[e] Section 5.2(c) are fundamental and essential for the protection of Buyers' and CBIZ's legitimate business and prosperity interests" and that "such provisions are reasonable and appropriate in all respects." Ex A. at § 5.2(c)(vi).

29.     Cryan further agreed that "Buyers' and CBIZ's remedies at law for any violation or attempted violation of" Cryan's "objections under Section 5.2(a) and 5.2(c) would be inadequate," and he agreed "that in the event of any such violation or attempted violation, CBIZ … shall [] be entitled to a temporary restraining order, temporary and permanent injunctions, and other equitable relief, without the necessity of posting any bond or proving any actual damage, in addition to all other rights and remedies that may be available to" CBIZ. Ex. A at § 5.2(d),

30.     Significantly, because CBIZ is in the business of purchasing independent companies and rolling them up under the CBIZ name, CBIZ's business model depends on and is built around these restrictive covenants being enforced.

31.     The restrictive covenants are a core part of the benefit CBIZ derives from purchasing regional insurance businesses.

32.     CBIZ's Business model would no longer be viable if individuals could sell their companies to CBIZ and then breach their restrictive covenants by competing with CBIZ.

### Following CBIZ's Acquisition of His Businesses, Cryan Becomes CBIZ's Regional President for the Southeastern United States

33.     Also in connection with the acquisition, CBIZ Insurance made Cryan its Regional President for the Southeast.

34.     As Regional President for the Southeast, Defendant Cryan's responsibilities included coordinating and managing all property and casualty operations in Florida, Georgia, Alabama, South Carolina and North Carolina, finding acquisition candidates within the Southeast Region, and providing support for the acquisition of such candidates, including analysis of targets and integration plans.

35.     Defendant Cryan supervised 86 CBIZ employees stationed in Florida, Georgia, Alabama, South Carolina, and North Carolina and approximately $30 million in annual revenue derived from insurance products and services marketed, sold, and serviced in those states.

36.     Defendant Bowman was hired by CBIZ in 2012 to directly report to, and serve as lead account executive for, Cryan's client accounts.

37.     Defendant Haynes, Cryan's son-in-law, was hired by CBIZ in 2015 and also indirectly reported to Cryan.

38.     Defendants McCoun, Leek, and Fischer were also among the employees Defendant Cryan supervised.

### Defendants Cryan, Bowman, Haynes, McCoun, Leek, and Fischer Sign Restrictive Covenants with CBIZ

39.     As a condition of their employment with CBIZ, Defendants Cryan, Bowman, Haynes, McCoun, Leek, and Fischer each entered into Confidentiality and Non-Solicitation Agreements with CBIZ (collectively "the Employment Agreements"). *See* Exhibits B–G.

40.     Each of the Employment Agreements contained restrictive covenants prohibiting Defendants Cryan, Bowman, Haynes, McCoun, Leek, and Fischer from disclosing or using CBIZ's Confidential Information for any purpose other than their employment with CBIZ.

41.     Specifically, Section 6 of Defendant Cryan's Agreement provides:

> **Nondisclosure.**  The Employee shall not at any time after the date of this Agreement directly or indirectly copy, disseminate or use, for his personal benefit or the benefit of any third party, any Confidential Information (as defined below), regardless of how such Confidential Information may have been acquired, except for the disclosure or use of such Confidential Information as may be (i) required by law or by court or administrative order (but only to the extent so required), (ii) reasonably necessary or required in order to conduct the business of the Company or any Affiliated Company or to otherwise carry out and perform the duties hereunder, including the recruiting of other service businesses as potential acquisition or merger candidates for the Company, CBIZ or any other Affiliated Company, or (iii) authorized in writing by the CBIZ Representative or by the Board of Directors of the Company.

Ex. B at § 6.

42.     Section 6 of Defendant Cryan's Employment Agreement defines "Confidential Information" broadly, to include:

> [A]ll information or knowledge belonging to, used by, or that is in the possession of Meridian, CBIZ, the Company or any other Affiliated Company relating to Meridian's, CBIZ's, the Company's or any other Affiliated Company's business, business plans, strategies, pricing, sales methods, clients or Qualified Prospective Clients (as defined in the Purchase Agreement) (including, without limitation, the names, addresses or telephone numbers of such clients or Qualified Prospective Clients), vendors, technology, programs, *finances, costs,* employees (including, without limitation, the names, addresses or telephone numbers of any employees), employee compensation rates or policies, marketing plans,

> development plans, computer programs, computer systems, inventions, developments, trade secrets, know-how or confidences of Meridian, CBIZ, the Company or any other Affiliated Company or Meridian's, CBIZ's, the Company's or any other Affiliated Company's business, without regard as to whether any of such Confidential Information may be deemed confidential or material to any third party, and Meridian, the Company, CBIZ and the Employee hereby stipulate to the confidentiality and materiality of such Confidential Information.

Ex. B at § 6.

43.     Section 3 of Defendants Bowman, Haynes, McCoun, Leek, and Fischer's Employment Agreements with CBIZ contain a non-disclosure provision that is identical in all material respects to the one quoted above from Cryan's Agreement. *See* Exs. C–G at § 3.

44.     Additionally, Defendant Cryan is prohibited for a period of three years after his departure from CBIZ from soliciting CBIZ's clients or employees by Section 5.2(c)(i) of Asset Purchase Agreement, which is expressly incorporated into Cryan's Employment Agreement with CBIZ. *See* Ex. A at § 5.2(c)(i)(A)–(E); Ex. B at §§ 5(d), 9.

45.     The Employment Agreements for Defendants Bowman, Haynes, McCoun, Leek, and Fischer also contain two additional restrictive covenants prohibiting them from soliciting CBIZ's clients or employees for a period of two years following their departure from CBIZ.

46.     The client non-solicitation provision is set forth in Section 5 of Defendants Bowman, Haynes, McCoun, Leek, and Fischer's Employment Agreements with CBIZ:

> **Non-Solicitation of Clients.**  During the time that Producer is employed by the Employer and for a period of two (2) years thereafter (the "Restricted Period"), Producer shall not, directly or indirectly (whether individually or as a shareholder, owner, investor, partner, director, officer, employee, consultant, creditor or agent of any person or entity), solicit, attempt to solicit or cause to be solicited, conduct business with, render any services to or accept money from any Client (as defined below) of the Employer or any other subsidiary or affiliate of CBIZ, Inc. ("CBIZ") for the servicing or sale of insurance products, employee management and related services other than any such activities performed for and on behalf of the Employer. As used herein, the term "Client" shall mean any person or entity that (a) received

services from the Employer or any other subsidiary or affiliate of CBIZ during the twenty-four (24) month period preceding Producer's last day of employment with the Employer or (b) was a prospective client who Employer contacted and actively solicited during the twelve (12) month period preceding Producer's last day of employment with Employer.
Exs. C–G at § 5.

47.     The employee non-solicitation provision is set forth in Section 6 of Defendants Bowman, Haynes, McCoun, Leek, and Fischer's Employment Agreements with CBIZ:

> **Non-Solicitation of Employees.** During the Restricted Period, Producer shall not, directly or indirectly, hire any employee of Employer, induce (or attempt to induce) or encourage any employee, representative or independent contractor of Employer to terminate its relationship with Employer, or otherwise interfere or attempt to interfere in any way with Employer's relationships with its employees, representatives, or independent contractors.

Exs. C–G at § 5.

48.     The Individual Defendants each agreed that the non-disclosure and non-solicitation provisions were reasonable and proper to protect CBIZ's legitimate business interests. Ex. B  at § 9(a); Exs. C–G at § 12.

49.     The Individual Defendants each agreed that their obligations to CBIZ would survive the termination of their employment. Ex. B  at § 2; Exs. C–G at §§ 3, 5, 6.

50.     The Individual Defendants each also agreed  that violations of these restrictive covenants would irreparably harm CBIZ and that CBIZ would have the right to seek injunctive relief for such violations.  Ex. B  at § 9(a); Exs. C–G at §§ 3, 7.

51.     The Individual Defendants each also agreed that their respective Agreements would be governed by and construed in accordance with the laws of the State of Ohio and irrevocably submitted to the jurisdiction of Ohio state and federal courts with venue in Cuyahoga County. Ex. B  at § 14; Exs. C–G at § 12.

### Cryan's Additional Non-Interference Obligation

52. Starting in 2016, pursuant to CBIZ's Equity Aligned Cash Bonus Plan, CBIZ annually awarded Cryan a cash bonus that was equivalent in value to thousands of units of CBIZ stock.

53. In 2016, CBIZ awarded Cryan a cash bonus equivalent in value to 4,000 units of CBIZ stock.

54. In 2017, CBIZ awarded Cryan a cash bonus equivalent in value to 3,000 units of CBIZ stock.

55. In 2018, CBIZ awarded Cryan a cash bonus equivalent in value to 2,450 units of CBIZ stock.

56. In 2019, CBIZ awarded Cryan a cash bonus equivalent in value to 2,544 units of CBIZ stock.

57. In 2020, CBIZ awarded Cryan a cash bonus equivalent in value to 2,096 units of CBIZ stock.

58. In 2021, CBIZ awarded Cryan a cash bonus equivalent in value to 1,468 units of CBIZ stock.

59. In 2022, CBIZ awarded Cryan a cash bonus equivalent in value to 1,251 units of CBIZ stock.

60. In 2023, CBIZ awarded Cryan a cash bonus equivalent in value to 1,510 units of CBIZ stock.

61. These awards were memorialized by the CBIZ Equity Aligned Cash Bonus Award Agreements ("Aligned Bonus Agreements") (*See, e.g.,* Exhibit H).

62. Importantly, these cash bonuses were expressly "conditioned on, and [were] acknowledged as adequate consideration for, [Cryan's] acceptance and compliance with [his] Non-

Interference Obligation," which CBIZ attached to the Aligned Bonus Agreements as an exhibit.

Ex. H at § 2(d).

63.     The Non-Interference Obligation provides:

> During [his] employment with Company ("Company" shall mean CBIZ, Inc. and any of its subsidiaries) and for a period of two (2) years following the termination of employment for any reason. [Cryan] shall not, directly or indirectly, solicit, attempt to solicit or cause to be solicited, accept business from, or render any services to, any client of the Company […] to which [Cryan] rendered services during the twelve (12) month period immediately prior to the date of termination of employment or to any prospective client which was contacted by [Cryan] during the six (6) month period immediately prior to the date of termination of employment.

> During [his] employment and for a period of two (2) years following the termination of employment for any reason, [Cryan] shall not, directly or indirectly, solicit, recruit, or hire any person who was employed by the Company during the six month period prior to the termination of [Cryan's] employment with the Company.

> [Cryan] understands and agrees that [his] obligations under this non-interference policy are separate from, and in addition to, any other obligation owed by [Cryan] to the Company under any other agreement between [Cryan] and the Company and do not replace or otherwise supersede any such agreements.  To the extent that more restrictive terms appear in such other agreements, those terms shall prevail and have application over and above the obligations stated in this document.

> [Cryan] understands and agrees that any breach of the foregoing provisions will result in irreparable injury to the Company.  In the event of a breach or threatened breach by [Cryan] of any of the foregoing conditions, the Company shall be entitled to specifically enforce this Non-Interference Policy and enjoin [Cryan] from violating any of its terms.  [Cryan] consents to a temporary and/or preliminary injunction specifically enforcing the foregoing conditions, without bond.  This remedy is in addition to all other remedies available to the Company, including the right to recover damages.  In addition to all remedies available to the Company, including but not limited to the right to injunctive relief, if [Cryan] breaches any of the foregoing conditions, any Award under the Plan shall be forfeited.

Ex. H at § 2(d).

### Defendants Cryan, Bowman, Haynes, McCoun, Leek, and Fischer Form a Conspiracy to Divert CBIZ Clients to a CBIZ Competitor

64.     Cryan received significant compensation from CBIZ as the Regional President for the Southeast—more than $11.5 million in total since 2012, including more than $2.3 million in 2023 alone—in addition to the more than $9 million Cryan received from CBIZ for the sale of his business in 2012.

65.     Still, in the fall of 2023, Cryan complained to CBIZ that he believed he was underpaid and undervalued.

66.     In direct violation of his covenant not to compete with CBIZ and his covenants not to solicit CBIZ's clients, Cryan, while still employed by CBIZ, began informing CBIZ's clients that he planned to leave CBIZ and start his own competing business.

67.     In conjunction with these communications, around the same time in 2023, upon information and belief, Defendant Cryan enlisted Defendants Bowman, Haynes, McCoun, Leek, and Fischer in a scheme to divert CBIZ's clients to Defendant EPIC.

68.     Upon information and belief, the Individual Defendants also enlisted their personal assistants, also CBIZ employees, in their unlawful scheme.

69.     Upon information and belief, Defendant EPIC conspired with and induced the Individual Defendants to breach their obligations to CBIZ through the promise of pecuniary rewards for diverting CBIZ's trade secrets, employees, and clients to EPIC.

70.     Upon information and belief, EPIC was aware, or should have reasonably been aware, of the Individual Defendants' contractual, common law, and statutory obligations to CBIZ.

Yet, EPIC, through its employees and agents, knowingly encouraged, induced, and facilitated the Individual Defendants in breaching those obligations.

### An Internal Investigation at CBIZ Discovers Potential Wrongdoing By Defendants Cryan, Bowman, and Haynes

71.     In March 2024, Defendant Bowman, with Defendant Cryan's knowledge and consent, created false invoices that overstated advances CBIZ had made for a client's insurance premiums.

72.     Although accurate invoices for the advances were initially entered into CBIZ's financial systems, Bowman, with Cryan's knowledge and consent, created false versions of the invoices that overstated the premium advancement by over $500,000.

73.     Bowman then provided the false invoices to the client who then submitted the false invoices to its lenders.

74.     As a result of Bowman's conduct, CBIZ received reimbursement that exceeded the premium advancement by over $500,000.

75.     Cryan and Bowman then directed CBIZ financial personnel to wire the excess funds directly to the client.

76.     The receipt of the surplus funds was flagged by CBIZ's finance department, which triggered an internal investigation that uncovered the irregularities described above.

77.     Cryan and Bowman were interviewed during the investigation. While they offered differing explanations for the premium overpayments, each acknowledged that the invoices were false and created at the client's request.

78.     Cryan and Bowman could not, of course, explain why the false invoices were necessary or appropriate.

79.     CBIZ returned the excess funds to the lenders who issued them to CBIZ.

80.     As a result of their misconduct, on May 29, 2024, CBIZ suspended Cryan without pay and terminated Bowman.

81.     CBIZ concluded that applicable law required it to report the false invoicing incident to the Florida and Georgia Departments of Insurance, and CBIZ did so on May 29, 2024.

### CBIZ Discovers that Defendant Haynes Improperly Transferred CBIZ's Confidential Information to a Personal Dropbox Account

82.     CBIZ discovered in May 2024 that Defendant Haynes, who is Cryan's son-in-law, had transferred approximately 30,000 computer files containing CBIZ's confidential information from CBIZ's internal systems to his own personal Dropbox account in March and April 2024.

83.     The information Haynes moved to his personal Dropbox included confidential client information.

84.     Storing CBIZ's confidential client information outside of CBIZ systems violates CBIZ's internal policies.

85.     Storing CBIZ's confidential client information outside of CBIZ systems also exposes CBIZ's information to theft and misappropriation, either by the offending employee or third parties.

86.     Haynes did not have permission to work outside of CBIZ's systems.

87.     As a result of his breach of and abject disregard for CBIZ policies, CBIZ terminated Haynes' employment on May 29, 2024.

88.     Upon information and belief, Haynes transferred client information from CBIZ's systems to his personal Dropbox account as part of the scheme he undertook with Defendants Cryan, Bowman, McCoun, Leek, and Fischer to divert CBIZ's trade secrets, employees, and clients to Defendant EPIC.

**Defendants Cryan, Bowman, Haynes, McCoun, Leek, and Fischer Begin Working for Defendant EPIC**

89. On June 10, 2024, Defendants McCoun, Leek, and Fischer resigned from CBIZ.

90. While on suspension by CBIZ for his misconduct related to the false invoices, Cryan secretly began working for Defendant EPIC and colluding with the other Individual Defendants to facilitate their defection (and the defection of their personal assistants) to EPIC. During this time, Cryan also worked with EPIC and the other Individual Defendants to prepare and induce CBIZ clients to divert their business to EPIC, in direct violation of the contractual, common law, and statutory obligations the Individual Defendants owed to CBIZ.

91. Cryan now claims to have resigned from CBIZ at some point in early June 2024, though he never offered any formal resignation to CBIZ.

92. Through LinkedIn Posts and a press release published to Defendant EPIC's website on June 14, 2024, CBIZ learned that the Individual Defendants are now employed by EPIC. *See* Exhibit I, *EPIC Adds Talent to Drive Growth Nationally*.

93. EPIC is an insurance broker and a direct competitor of CBIZ.

94. The press release published to EPIC's website states that Defendant Cryan and "his team," consisting of Bowman, Haynes, McCoun, Leek, and Fischer, would be furthering "EPIC's property & casualty [insurance] operations" and "will be located across EPIC's Georgia and Florida offices." Ex. I at 1.

**In a Matter of Days, CBIZ Has Lost Nearly $2 Million in Client Business as a Result of Defendants' Unlawful Conduct**

95. Upon information and belief, Cryan, while still employed by CBIZ, began contacting CBIZ clients to inform them that he planned to leave CBIZ.

96.     During his suspension beginning on May 29, 2024, Cryan had no lawful business purpose to contact CBIZ clients.

97.     Similarly, once Defendants Bowman, Haynes, McCoun, Leek, and Fischer were terminated by, or resigned from, CBIZ on or before June 10, 2024, they had no lawful business purpose to continue dealing with CBIZ clients.

98.     Nevertheless, during these times, the Individual Defendants continued contacting CBIZ clients.

99.     Upon information and belief, the purpose of the Individual Defendants' contact with CBIZ clients was and is to divert them to Defendant EPIC.

100.    Insurance regulations require insurance brokers such as CBIZ and EPIC to issue "broker of record" notice letters when an insurance policy changes brokers.

101.    Since June 10, 2024, CBIZ has received broker of record notices from at least 18 clients notifying CBIZ that they are changing their insurance broker to Defendant EPIC. *See* Exhibit J, June 14, 2024 Broker of Record Report from CBIZ's Internal Systems.

102.    The clients diverted to Defendant EPIC include 13 whose primary point of contact at CBIZ was Defendant Cryan alone or Defendant Cryan jointly with one of the other Individual Defendants, providing annual revenue for CBIZ totaling $1,577,431.

103.    Additional clients diverted to Defendant EPIC by Defendants Bowman, Haynes, McCoun, Leek, and Fischer generated annual revenue for CBIZ totaling $333,967.

## COUNT ONE: BREACH OF CONTRACT
### (against Defendants Cryan, Bowman, Haynes, McCoun, Leek, and Fischer)

104.    CBIZ incorporates all previous paragraphs as if set forth herein.

105.    Cryan's Employment Agreement, the Asset Purchase Agreement, and the Aligned Bonus Agreements are valid and binding agreements. *See* Exs. A, B, & H.

106.    Defendants Bowman, Haynes, McCoun, Leek, and Fischer's Employment Agreements are valid and binding agreements. *See* Exs. C–G.

107.    CBIZ fulfilled its obligations pursuant to each of these agreements.

108.    The Individual Defendants have breached the nondisclosure provisions of their respective agreements by, among other things, directly or indirectly copying, disseminating and/or using CBIZ's Confidential Information, as defined in the Agreements, for their personal benefit and the benefit of Defendant EPIC.

109.    The Individual Defendants have further breached the restrictive covenants in their respective agreements by, among other things: (1) soliciting and diverting CBIZ's clients to Defendant EPIC; and (2) inducing or encouraging CBIZ's employees (including one another and their personal assistants) to leave CBIZ.

110.    Further, Defendant Cryan has independently breached the restrictive covenant in the Asset Purchase Agreement with CBIZ by accepting employment with Defendant EPIC, a direct competitor of CBIZ. Ex. A at § 5.2(c).

111.    Cryan also breached his non-interference obligation by: (1) soliciting, attempting to solicit, and diverting CBIZ's clients to Defendant EPIC; and (2) soliciting, recruiting, or hiring CBIZ employees. Ex. H at § 2(d).

112.    As a direct and proximate consequence of the Individual Defendants' breaches of their agreements with CBIZ, CBIZ has already suffered millions in damages.

113.    CBIZ has suffered, and will continue to suffer, irreparable harm and other damage as a result of the Individual Defendants' unlawful actions, including loss of client relationships, loss of the trust and confidence of its remaining clients, loss of good will, loss of business

reputation, loss of competitive position, and losses caused by CBIZ's confidential information being used by Defendant EPIC or other competitors.

114. A temporary restraining order, preliminary injunction, and permanent injunction enjoining Defendant Cryan from: (1) directly or indirectly, soliciting, servicing and/or accepting business from CBIZ's clients; (2) directly or indirectly inducing or encouraging CBIZ's employees to leave CBIZ and join him; (3) directly or indirectly competing with CBIZ; (4) directly or indirectly copying, disseminating and/or using CBIZ's Confidential Information, as defined in Cryan's Agreement, for his personal benefit; and (5) requiring the return of CBIZ's Confidential Information, as defined in Cryan's Agreement, is necessary to prevent further irreparable harm to CBIZ.

115. Further, a temporary restraining order, preliminary injunction, and permanent injunction enjoining Defendants Bowman, Haynes, McCoun, Leek, and Fischer from: (1) directly or indirectly, soliciting, servicing and/or accepting business from CBIZ's clients; (2) directly or indirectly inducing or encouraging CBIZ's employees to leave CBIZ; (4) directly or indirectly copying, disseminating and/or using CBIZ's Confidential Information, for their personal benefit; and (5) requiring the return of CBIZ's Confidential Information is necessary to prevent further irreparable harm to CBIZ.

### COUNT TWO: BREACH OF THE FIDUCIARY DUTY OF LOYALTY
**(against Defendants Cryan, Bowman, Haynes, McCoun, Leek, and Fischer)**

116. CBIZ incorporates all previous paragraphs as if rewritten herein.

117. The Individual Defendants were each CBIZ employees with client-facing roles.

118. CBIZ placed significant trust and confidence in the Individual Defendants to preserve and protect CBIZ's client relationships, goodwill, and confidential information.

119.     As a result, the Individual Defendants owed CBIZ a fiduciary duty of loyalty to preserve and protect CBIZ's client relationships, goodwill, and confidential information.

120.     The Individual Defendants breached their fiduciary duty of loyalty to CBIZ by engaging in a scheme to divert CBIZ's clients to Defendant EPIC while they were still CBIZ employees.

121.     The Individual Defendants also breached their fiduciary duty of loyalty to CBIZ by copying and removing CBIZ's confidential information from CBIZ's secure computer systems while they were still employed by CBIZ.

122.     The Individual Defendants' violations of their duty of loyalty to CBIZ have already caused millions in damages to CBIZ to date.

### COUNT THREE: VIOLATION OF THE DEFEND TRADE SECRETS ACT 18 U.S.C. § 1836, *et seq.*
**(against All Defendants)**

123.     CBIZ incorporates all previous paragraphs as if rewritten herein.

124.     In their positions as CBIZ employees, the Individual Defendants had access to CBIZ's Confidential Information, including client lists and confidential client information.

125.     CBIZ went to great expense over the course of many years to discover, develop, and assemble the Trade Secret Information, including client lists and confidential client information.

126.     Upon information and belief, CBIZ's trade secrets are being misused and misappropriated to benefit the Individual Defendants and their new employer, Defendant EPIC.

127.     CBIZ's trade secrets are not generally available to the public or CBIZ's competitors.

128.     CBIZ derives independent economic value from its trade secrets, including client lists and confidential client information, not being known to its competitors who could exploit them for their own pecuniary gain.

129.     CBIZ has implemented reasonable security measures to keep its trade secrets safe, including by using firewall- and password-protected computer systems, publishing internal policies regarding the handling of trade secrets, and requiring all employees with access to Confidential Information to refrain from using it for any purpose other than CBIZ's business.

130.     The Individual Defendants were well aware of the confidential and proprietary nature of CBIZ's trade secrets, including client lists and confidential client information, because they each signed agreements containing non-disclosure provisions.

131.     Further, Defendant EPIC was well aware that CBIZ derives independent economic value and takes substantial measures to protect its trade secret information and that CBIZ prohibits current and former employees from using CBIZ trade secrets for purposes other than CBIZ's business.

132.     Despite this, the Individual Defendants willfully, wrongfully, and maliciously misappropriated CBIZ's trade secrets for their benefit and for the benefit of their new employer, Defendant EPIC, in violation of the law, by removing the trade secrets from CBIZ's secure computer systems and using them to compete with CBIZ and divert CBIZ's clients.

133.     Further, Defendant EPIC willfully, wrongfully, and maliciously received CBIZ's trade secrets from the Individual Defendants despite having full awareness that they had obtained the trade secrets wrongfully.

134.     To date, Defendants have already used CBIZ's misappropriated trade secrets to divert client relationships worth nearly $2 million.

135.    CBIZ has suffered, and will continue to suffer, damages and irreparable harm unless Defendants are enjoined from continuing to benefit from their unlawful use of CBIZ's trade secrets.

**COUNT FOUR: VIOLATION OF THE OHIO UNIFORM TRADE SECRETS ACT,**
**Ohio Revised Code §§ 1333.61–69**
**(against All Defendants )**

136.    CBIZ incorporates all previous paragraphs as if rewritten herein.

137.    In their positions as CBIZ employees, the Individual Defendants had access to CBIZ's Confidential Information, including client lists and confidential client information.

138.    CBIZ went to great expense over the course of many years to discover, develop, and assemble the Trade Secret Information, including client lists and confidential client information.

139.    Upon information and belief, CBIZ's trade secrets are being misused and misappropriated to benefit the Individual Defendants and their new employer, Defendant EPIC.

140.    CBIZ's trade secrets are not generally available to the public or CBIZ's competitors.

141.    CBIZ derives independent economic value from not its trade secrets, including client lists and confidential client information, not being known to its competitors who could exploit them for their own pecuniary gain.

142.    CBIZ has implemented reasonable security measures to keep its trade secrets safe, including by using firewall- and password-protected computer systems, publishing internal policies regarding the handling of trade secrets, and requiring all employees with access to Confidential Information to refrain from using it for any purpose other than CBIZ's business.

143.    The Individual Defendants were well aware of the confidential and proprietary nature of CBIZ's trade secrets, including client lists and confidential client information, because they each signed agreements containing non-disclosure provisions.

144.    Further, Defendant EPIC was well aware that CBIZ derives independent economic value and takes substantial measures to protect its trade secret information.

145.    Despite this, the Individual Defendants willfully, wrongfully, and maliciously misappropriated CBIZ's trade secrets for their benefit and for the benefit of their new employer, Defendant EPIC, in violation of the law, by removing the trade secrets from CBIZ's secure computer systems and using it to compete with CBIZ and divert CBIZ's clients.

146.    Further, Defendant EPIC willfully, wrongfully, and maliciously received CBIZ's trade secrets from the Individual Defendants despite having full awareness that they had obtained the trade secrets wrongfully.

147.    To date, Defendants have already used CBIZ's misappropriated trade secrets to divert client relationships worth nearly $2 million.

148.    CBIZ has suffered, and will continue to suffer, damages and irreparable harm unless Defendants are enjoined from continuing to benefit from their unlawful use of CBIZ's trade secrets.

### COUNT FIVE: TORTIOUS INTERFERENCE WITH CONTRACT
### (against Defendant EPIC)

149.    CBIZ incorporates all previous paragraphs as if rewritten herein.

150.    Defendant Cryan's Employment Agreement, the Asset Purchase Agreement, and the Aligned Bonus Agreements are valid and binding agreements. Exs. A, B, & H.

151.    Additionally, Defendants Bowman, Haynes, McCoun, Leek, and Fischer's Employment Agreements are valid and binding agreements. Exs. C–G.

152. Upon information and belief, Defendant EPIC has knowledge of the non-disclosure and non-solicitation provisions of the Individual Defendants' respective agreements with CBIZ.

153. Defendant EPIC knowingly and intentionally encouraged, assisted, and procured the breach of the non-disclosure and non-solicitation provisions of the Individual Defendants' respective agreements with CBIZ through promises of pecuniary gain for diversion of trade secrets, employees, and clients from CBIZ to EPIC.

154. Defendant EPIC's conduct constitutes improper means because it violates both statutory and common law.

155. Defendant EPIC were not justified or privileged and were contrary to law and the norms of the insurance industry.

156. To date, Defendant EPIC's conduct has already caused CBIZ's to lose client relationships worth nearly $2 million.

157. CBIZ has suffered, and will continue to suffer, irreparable harm due to Defendant EPIC's tortious conduct.

### COUNT SIX: TORTIOUS INTERFERENCE WITH BUSINESS EXPECTANCY
#### (against Defendant EPIC)

158. CBIZ incorporates all previous paragraphs as if rewritten herein.

159. CBIZ had valid business relationships with its existing clients and had a reasonable expectation of those client relationships continuing.

160. Defendant EPIC knew that CBIZ had a reasonable expectation of those client relationships continuing.

161. Defendant EPIC intentionally interfered with CBIZ's reasonable economic expectancy in those client relationships through improper means by inducing and procuring the

Individual Defendants to breach their employment agreements with CBIZ and divert CBIZ's client relationships to EPIC.

162. To date, as a result of Defendant EPIC's intentional and improper interference, CBIZ has lost client relationships worth nearly $2 million.

163. CBIZ has suffered, and will continue to suffer, irreparable harm due to Defendant EPIC's tortious conduct.

### COUNT SEVEN: CIVIL CONSPIRACY
**(against all Defendants)**

164. CBIZ incorporates all previous paragraphs as if rewritten herein.

165. Defendant EPIC and the Individual Defendants mutually agreed to engage in a scheme in which the Individual Defendants would violate their contractual, common law, and statutory duties to CBIZ by diverting CBIZ trade secrets, clients, and employees to EPIC.

166. In furtherance of the scheme, the Individual Defendants, while still employed by CBIZ, began informing CBIZ's clients of their intention to join Defendant EPIC and removed confidential client information and other CBIZ trade secrets from CBIZ's secure computer systems.

167. Defendant EPIC promised the Individual Defendants financial rewards for diverting CBIZ trade secrets, clients, and employees to EPIC.

168. The unlawful acts set forth in Counts I through VI above describe the substantive acts through which Defendants' accomplished their conspiracy.

169. As a direct result of Defendants' tortious conduct, CBIZ has suffered, and will continue to suffer, irreparable harm.

WHEREFORE, Plaintiff CBIZ respectfully requests that judgment be entered in its favor and against Defendants as follows:

(A) That this Court issue a temporary restraining order, preliminary injunction, and permanent injunction enjoining and restraining Defendant Cryan and his agents, servants, employees, and attorneys, and all other persons who are in active concert or participation with him, from:

(1) directly or indirectly keeping or maintaining in any form, copying, disseminating, or using, for their personal benefit or the benefit of Defendant EPIC or any third party, CBIZ's Confidential Information;

(2) entering into, engaging in, promoting, assisting (financially or otherwise), or consulting with any business, enterprise, or activity which competes, or would compete, with CBIZ, as defined in the Asset Purchase Agreement, including Defendant EPIC, anywhere within a 200-mile radius of an offer location of CBIZ or its affiliates, for a period of three years;

(3) soliciting (or attempting to solicit) business patronage from or calling on, or conducting business with, rendering services to, or accepting money from, any vendors, any clients or any Qualified Prospective Client, as defined in the Asset Purchase Agreement, anywhere in the United States, or interfering (or attempting to interfere) with any relationship of any Affiliated Company, as defined in the Asset Purchase Agreement, with any vendor or client, for a period of five years;

(4) inducing (or attempting to induce) or encouraging any employee, officer, director, member, manger, partner, shareholder, sales representative, agent, vendor, or independent contractor of any Affiliated Company, as defined in the Asset Purchase Agreement, to terminate its relationship with such Affiliated Company, as defined in the Asset Purchase Agreement, or otherwise interfere or attempt to interfere in any way with any Affiliated Company's, as defined in the Asset Purchase Agreement, relationships with its employees, officers, directors, members, managers, partners, shareholders, sales representatives, agents, vendors, independent contractors, or others for a period of three years;

(B)    That this Court issue a temporary restraining order, preliminary injunction, and permanent injunction enjoining and restraining Defendants Bowman, Haynes, McCoun, Leek, and Fischer and their agents, servants, employees, and attorneys, and all other persons who are in active concert or participation with them, from:

    (1)    directly or indirectly keeping or maintaining in any form, copying, disseminating, or using, for their personal benefit or the benefit of Defendant EPIC or any third party, CBIZ's Confidential Information;

    (2)    directly or indirectly (whether individually or as a shareholder, owner, investor, partner, director, officer, employee, consultant, creditor or agent of any person or entity), soliciting, attempting to solicit or causing to be solicited, conducting business with, rendering any services to or accepting money from any Client (as defined below) of the Employer or any other subsidiary or affiliate of CBIZ, Inc. ("CBIZ") for the servicing or sale of insurance products, employee management and related services other than any such activities performed for and on behalf of the Employer for a period of two years.

    (3)    directly or indirectly, hire any employee of Employer, inducing (or attempting to induce) or encouraging any employee, representative or independent contractor of Employer to terminate its relationship with Employer, or otherwise interfering or attempting to interfere in any way with Employer's relationships with its employees, representatives, or independent contractors for a period of two years.

(C)    That this Court issue a temporary restraining order, preliminary injunction, and permanent injunction enjoining and restraining Defendant EPIC and its agents, servants, employees, and attorneys, and all other persons who are in active concert or participation with it, from:

    (1)    keeping or maintaining in any form or using any trade secret information or confidential information belonging to CBIZ that it has received from any current or former CBIZ employee, including Defendants Cryan, Bowman, Haynes, McCoun, Leek, and Fischer;

      (2)      inducing or encouraging any current or former CBIZ employee, including Defendants Cryan, Bowman, Haynes, McCoun, Leek, and Fischer, to breach their contractual, statutory, or common law duties to CBIZ; and

      (3)      interfering with CBIZ's existing client relationships through improper means, including by using trade secrets misappropriated from CBIZ and/or by inducing or encouraging any current or former CBIZ employee, including Defendants Cryan, Bowman, Haynes, McCoun, Leek, and Fischer, to breach their contractual, statutory, or common law duties to CBIZ.(D)      That Defendants Cryan, Bowman, Haynes, McCoun, Leek, and Fischer immediately identify all clients and prospective clients of CBIZ or past clients of CBIZ that they (or any of their agents or other persons or entities acting in aid of, or in concert with, or participation with them) have contacted, whether directly or indirectly, or from whom they have accepted any business on his own behalf or on behalf of any entity;

(D)      That Defendants Cryan, Bowman, Haynes, McCoun, Leek, and Fischer immediately identify all employees, officers, directors, members, managers, partners, shareholders, sales representatives, agents, vendors, or independent contractors of CBIZ or an Affiliated Company, or former employees, officers, directors, members, managers, partners, shareholders, sales representatives, agents, vendors, or independent contractors of CBIZ or an Affiliated Company, that Defendants Cryan, Bowman, Haynes, McCoun, Leek, and Fischer (or any of their agents or other persons or entities acting in aid of, or in concert with, or participation with them) have contacted, whether directly or indirectly, for the purpose of inducing (or attempting to induce) or encouraging to terminate its relationship with CBIZ and/or an Affiliated Company, or to interfere with or attempt to interfere with CBIZ's and/or an Affiliated Company's relationship with that individual or entity;

(E)      That Defendants immediately return any and all confidential information, in any form, which has been taken, transferred, downloaded and/or copied from CBIZ, including, but not limited to any client, customer, and/or referral lists and information and that Defendants keep no copies of such confidential information;

(F)     That, CBIZ be awarded compensatory damages in an amount to be proven at trial, but that will exceed $75,000;

(G)     That, with regard to Counts III, IV, V, VI, and VII, the Court find that Defendants' conduct was willful and malicious and, therefore, that it award CBIZ punitive damages and attorney's fees in an amount to be proven at trial;

(H)     That this Court order such other relief as may be just and required under the circumstances of the case.

Respectfully submitted,

*/s/ Jeffrey S. Dunlap*
Jeffrey S. Dunlap (0067923)
Lawrence D. Pollack (0042477)
Ashtyn N. Saltz (0089548)
Ryan W. Gillespie (0102606)
UBGREENSFELDER LLP
Skylight Office Tower
1660 West 2nd Street, Suite 1100
Cleveland, Ohio 44113-1448
(216) 583-7000
(216) 583-7001 (Fax)
jdunlap@ubglaw.com
lpollack@ubglaw.com
asaltz@ubglaw.com
rgillespie@ubglaw.com

*Counsel for Plaintiffs*

VERIFICATION

STATE OF _OHIO_ )
                                    ) SS:
COUNTY OF _CUYAHOGA_ )

     _MICHAEL Kouzelos_ of CBIZ, Inc., having been duly sworn, states that [he/she]

has read the forgoing Verified Complaint and that the allegations therein are, to the best of his

knowledge and belief, true and accurate.

_____
[NAME]

     SWORN TO BEFORE ME, and subscribed in my presence, this _18th_ day, of June

2024.

DEBORAH F. BREIMAIER
Notary Public
State of Ohio
My Comm. Expires
July 30, 2027

_____
Notary Public

33