# EXHIBIT B

## EMPLOYMENT AGREEMENT

The assets of Meridian Insurance Group, LLC, a Florida limited liability company ("Meridian"), were purchased by CBIZ Benefits & Insurance Services, Inc., a Missouri corporation ("CBIZ B&I"), and CBIZ Insurance Services, Inc., a Maryland corporation (the "Company"), pursuant to the terms of a certain Asset Purchase Agreement dated as of the date hereof (the "Purchase Agreement") among the Company, CBIZ B&I, Meridian and the direct and indirect owners of Meridian, including Gregory J. Cryan (the "Employee"). In connection with the consummation of the transaction contemplated by the Purchase Agreement, the Company desires to procure the services of the Employee, and the Employee desires to be employed by the Company, upon the following terms and conditions:

1.     Employment and Duties.

(a)     The Company hereby agrees to employ the Employee and the Employee hereby agrees to be employed by the Company as Southeast Regional President of the Company subject to the terms and conditions of this Agreement.  The Employee shall report to Michael Gill, President of the Company, or his equivalent or superior (the "CBIZ Representative"), and shall have such responsibilities as may from time to time be prescribed by the CBIZ Representative.  Such responsibilities shall include (i) coordinating and managing all property and casualty operations in Florida, Georgia, Alabama, South Carolina and North Carolina and (ii) finding acquisition candidates within the Southeast Region and providing support for the acquisition of such candidates, including analysis of targets and integration plans.

(b)     The Employee agrees to perform such duties as may be assigned by the CBIZ Representative, devote all of his working time to the business of the Company, and use his best efforts to advance the interests of the Company and its owners including, without limitation, the referral of business to the Company and its  respective subsidiaries and affiliates, including, without limitation, CBIZ, Inc., a Delaware corporation ("CBIZ" and together with the other subsidiaries and affiliates of the Company, each an "Affiliated Company" and collectively, the "Affiliated Companies").

2.     Term.  The Company's employment of the Employee shall be on an employment at will basis commencing on January 1, 2012 (the "Commencement Date").  The Employee's obligations and the rights of the Company or any other Affiliated Company under the Purchase Agreement, including, without limitation, Sections 5.1(b), 5.2(a), 5.2(c) and 5.2(d) and 8.8 (the "Purchase Agreement Obligations"), and under this Agreement, including, without limitation, Sections 6, 7, 8, 9 and 14 (the "Employment Agreement Obligations"), shall survive the expiration or earlier termination, for any reason or on any basis, of this Agreement or of the Employee's employment with the Company.

3.     Compensation.

(a)     For the period commencing on the Commencement Date and continuing until the third (3rd) anniversary of the Commencement Date (the "Initial Compensation Period"), the Company shall pay the Employee an amount of compensation as specified in **Exhibit A**, which is incorporated herein and made a part of this Agreement by reference.

(b)     Following the expiration of the Initial Compensation Period, the Employee's compensation shall be pursuant to the compensation formula in effect for all other similarly-situated employees of the Company.

(c)     All compensation hereunder shall be payable in accordance with the Company's standard payroll practices in effect for all employees.

(d)     The Company shall reimburse the Employee for all reasonable and necessary business expenses incurred by him in the course of performing his duties under this Agreement that are consistent with the Company's policies in effect from time to time with respect to travel, entertainment and other business expenses.

4.     Benefits.  Except as may otherwise be agreed upon among the parties in writing, during the term of this Agreement, the Employee shall be eligible to participate in and receive benefits generally afforded by the Company to its employees from time to time.

5.     Disability or Death; Resignation; Termination for Cause; Other Terminations.

(a)     Death.  In the event of the Employee's death, this Agreement and the Employee's employment shall terminate effective on the date of Employee's death, except that the Employee's estate shall be entitled to receive the unpaid portion of the Base Salary and unpaid Commissions (each as defined on **Exhibit A**) earned up to the date of his death and all unreimbursed expenses; and the Employee's designated beneficiary (or, in the absence of a designated beneficiary, the Employee's estate) shall be entitled to receive all benefits payable as a result of the Employee's death under the terms of the Company's employee benefit plans then in existence.

(b)     Disability and Illness.

(i)     Short-Term.  Until the expiration of the Initial Compensation Period, the Employee shall be entitled to continued payments of Base Salary, unpaid Commissions, and benefits in accordance with Sections 3(a) and 4 hereof during the first one hundred seventy-nine (179) consecutive days of disability or illness, which disability or illness prevents the Employee from performing his duties on a full-time basis, and shall not be entitled to receive any other compensation for disability or illness during such period.  Disagreements concerning the question of disability or illness shall be decided by a physician selected by the Company.  The decision of such physician shall be final and binding.

(ii)     Long-Term.  The Company may terminate the Employee's employment if the Employee is incapacitated for a period of one hundred eighty (180) consecutive days or more due to disability or illness which prevents the Employee from performing his duties hereunder on a full-time basis.  If the Employee's employment is terminated pursuant to this Section 5(b)(ii), all of Employee's rights and all of the Company's obligations hereunder shall immediately terminate.  Notwithstanding the foregoing, the Employee's obligations and the Company's rights and obligations under the Purchase Agreement, including, without limitation, the Purchase Agreement Obligations, and under this Agreement, including, without limitation, the Employment Agreement Obligations, shall survive the termination of this Agreement and the Employee shall be entitled to receive the unpaid

2

portion of the Base Salary and unpaid Commissions earned up to the date of such termination, all unreimbursed expenses and all benefits payable to the Employee as a result of such termination under the terms of the Company's employee benefit plans then in existence.

(c)  Resignation. If the Employee's employment is terminated during the Initial Compensation Period by reason of the Employee's voluntary resignation without Good Reason (as defined in Section 5(e) below), or if the Employee's employment is terminated following the Initial Compensation Period by the Employee's voluntary resignation for any reason, all of the Employee's rights and all of the Company's obligations hereunder shall terminate effective on the date of the Employee's resignation. Notwithstanding the foregoing, the Employee's obligations and the Company's rights and obligations under the Purchase Agreement, including, without limitation, the Purchase Agreement Obligations, and under this Agreement, including, without limitation, the Employment Agreement Obligations, shall survive the termination of this Agreement and the Employee shall be entitled to receive the unpaid portion of the Base Salary earned up to the date of such termination and all benefits payable to the Employee as a result of such termination under the terms of the Company's employee benefit plans then in existence.

(d)  Termination for Cause. The Company may terminate the Employee's employment at any time for cause (as defined below). If the Employee's employment is terminated pursuant to this Section 5(d), all of the Employee's rights and all of the Company's obligations hereunder shall immediately terminate. As used in this section, "for cause" shall mean (i) violation of the Company's and/or CBIZ's written policies and procedures as in effect from time to time, (ii) fraud, misappropriation of funds, products, services or property, theft, embezzlement or willful conduct on the part of the Employee that is materially injurious to the Company, CBIZ or any other Affiliated Company, (iii) the conviction of a felony or the commission of an act involving moral turpitude, (iv) the Employee's failure to perform his assigned duties with the Company, which failure has not been cured within thirty (30) days after notice of such failure is given to the Employee by the CBIZ Representative, (v) the Employee's breach of any provision of the Purchase Agreement or this Agreement, which breach has not been cured within thirty (30) days after notice of such breach is given to the Employee by the CBIZ Representative, although no thirty day cure period is required prior to termination resulting from Employee's breach of Sections 5.1(b), 5.2(a), 5.2(c), 5.2(d) and 8.8 of the Purchase Agreement or of Sections 6, 7 or 8 of this Agreement, (vi) the Employee's failure to qualify (or having so qualified, being thereafter disqualified) under any suitability or licensing requirement to which the Employee may be subject by reason of his position with the Company or (vii) the Employee's failure to achieve the annual goals, including production goals, if any, documented in writing by the Employee and the CBIZ Representative.

Notwithstanding a termination of this Agreement pursuant to this Section 5(d), the Employee's obligations and the rights and obligations of the Company or any other Affiliated Company under the Purchase Agreement, including, without limitation, the Purchase Agreement Obligations, and under this Agreement, including, without limitation, the Employment Agreement Obligations, shall survive the termination of this Agreement and the Employee shall be entitled to receive the unpaid portion of the Base Salary earned, and commissions earned and not received, if any, up to the date of such termination.

3

     (e)    Termination Without Cause or for Good Reason.

     (i)    The Company may terminate the Employee's employment at any time without cause pursuant to written notice provided to the Employee. The Employee may terminate his employment with the Company at any time during the Initial Compensation Period for Good Reason (as defined below); provided, however, that to exercise his right to terminate his employment for Good Reason during the Initial Compensation Period, the Employee must provide written notice to the Company of his belief that Good Reason exists, and that notice shall describe the circumstance believed to constitute Good Reason. If that circumstance may reasonably be remedied, the Company shall have thirty (30) days to effect that remedy. If not remedied within that thirty (30)-day period, the Employee may terminate his employment for Good Reason.

     (ii)    If the Employee's employment is terminated without cause or for Good Reason pursuant to Section 5(e)(i), all of the Employee's rights and all of the Company's obligations hereunder shall immediately terminate. Notwithstanding the foregoing, (A) during the Initial Compensation Period, if the Employee's employment is terminated without cause or for Good Reason pursuant to Section 5(e)(i), then the Company shall continue to pay the Employee his Base Salary (measured at the time of termination) and commissions in accordance with Section 3 hereof for six (6) months following the date of termination and (B) after the Initial Compensation Period, if the Employee's employment is terminated without cause, then the Company will continue to pay the Employee in accordance with the Company's then-standard severance policy to the extent applicable to the Employee; provided, however, that to be eligible to receive such payments under clause (A) or (B) of this Section 5(e)(ii), the Employee must, at the time of termination, execute and deliver a valid, binding and irrevocable general release in a form to be provided by the Company.

     (iii)    "Good Reason" shall mean, in the absence of the Employee's written consent and unless there exists cause for termination pursuant to Section 5(d), the occurrence of any of the following: (A) the assignment to the Employee by the Company of duties that are materially inconsistent with the duties described in Section 1(a) hereof without his prior written consent, other than an isolated, insubstantial or inadvertent assignment not occurring in bad faith and which is remedied by the Company promptly after receipt of notice thereof given by the Employee; (B) a reduction in the Employee's Base Salary without his prior written consent, other than an isolated, insubstantial or inadvertent reduction not occurring in bad faith and which is remedied by the Company promptly after receipt of notice thereof given by the Employee; or (C) the relocation of the Employee's principal office to a location outside of the Atlanta, Georgia metropolitan area without the Employee's prior written consent.

     (iv)    Notwithstanding a termination of this Agreement pursuant to this Section 5(e), the Employee's obligations and the Company's rights and obligations under the Purchase Agreement, including, without limitation, the Purchase Agreement Obligations, and under this Agreement, including, without limitation, the Employment Agreement Obligations, shall survive the termination of this Agreement.

4

6.    Nondisclosure.  The Employee shall not at any time after the date of this Agreement directly or indirectly copy, disseminate or use, for his personal benefit or the benefit of any third party, any Confidential Information (as defined below), regardless of how such Confidential Information may have been acquired, except for the disclosure or use of such Confidential Information as may be (i) required by law or by court or administrative order (but only to the extent so required), (ii) reasonably necessary or required in order to conduct the business of the Company or any Affiliated Company or to otherwise carry out and perform the duties hereunder, including the recruiting of other service businesses as potential acquisition or merger candidates for the Company, CBIZ or any other Affiliated Company, or (iii) authorized in writing by the CBIZ Representative or by the Board of Directors of the Company.  For purposes of this Agreement, the term "Confidential Information" shall mean all information or knowledge belonging to, used by, or that is in the possession of Meridian, CBIZ, the Company or any other Affiliated Company relating to Meridian's, CBIZ's, the Company's or any other Affiliated Company's business, business plans, strategies, pricing, sales methods, clients or Qualified Prospective Clients (as defined in the Purchase Agreement) (including, without limitation, the names, addresses or telephone numbers of such clients or Qualified Prospective Clients), vendors, technology, programs, finances, costs, employees (including, without limitation, the names, addresses or telephone numbers of any employees), employee compensation rates or policies, marketing plans, development plans, computer programs, computer systems, inventions, developments, trade secrets, know-how or confidences of Meridian, CBIZ, the Company or any other Affiliated Company or Meridian's, CBIZ's, the Company's or any other Affiliated Company's business, without regard as to whether any of such Confidential Information may be deemed confidential or material to any third party, and Meridian, the Company, CBIZ and the Employee hereby stipulate to the confidentiality and materiality of such Confidential Information.  Notwithstanding anything to the contrary contained in the preceding sentence, the term "Confidential Information" shall exclude any information that the Employee can establish by clear and convincing evidence (A) is publicly known through no wrongful act of Meridian or the Employee, (B) becomes known to the Employee through no wrongful act of Meridian or the Employee, by disclosure from a third party under no obligation or duty of secrecy with respect to such information (excluding any employee, agent, representative, vendor, customer or other person or entity with a contractual or business relationship with the Company, CBIZ or any other Affiliated Company), or (C) is developed by the Employee after termination of employment with the Company or any other Affiliated Company or developed by the Employee before termination of employment with the Company or any other Affiliated Company on his own time and that does not relate to any business that Meridian, CBIZ, the Company or any other Affiliated Company has at any time engaged in on the Commencement Date or at any time during the period of the Employee's employment with the Company or any other Affiliated Company or has a bona fide plan of engaging in at the time of the termination of the Employee's employment.  Each party acknowledges that all of the Confidential Information is and shall continue to be the exclusive proprietary property of the Company, CBIZ or any other Affiliated Company, whether or not prepared in whole or in part by any party and whether or not disclosed to or entrusted to the custody of any party.  The Employee agrees that upon the request of the Company, CBIZ or any other Affiliated Company, the Employee will return promptly to the Company, CBIZ or any such Affiliated Company all memoranda, notes, records, reports, manuals, pricing lists, prints and other documents (and all copies thereof) relating to CBIZ's, the Company's or any other

Affiliated Company's business, including, without limitation, the Business, as defined in the Purchase Agreement, which the Employee then may possess or have within his control, regardless of whether any such documents constitute Confidential Information. The Employee further agrees that he shall forward to the Company or CBIZ all Confidential Information that at any time comes into his possession or the possession of any other person or entity with which he is affiliated in any capacity.

      7.    <u>No Slander</u>. The Employee agrees not to in any way slander or injure the business reputation or goodwill of the Company, CBIZ or any other Affiliated Company, including, by way of illustration, through any contact with clients, Qualified Prospective Clients, vendors, suppliers, employees or agents of the Company, CBIZ or any other Affiliated Company which could slander or injure the business reputation or goodwill of the Company, CBIZ or any other Affiliated Company.

      8.    <u>Work Product</u>.

      (a)    Employee will promptly disclose to Company, or any persons designated by it, all improvements, inventions, designs, ideas, Works, discoveries, reports, drawings, procedures, practices, software codes, systems, products, methods, procedures, concepts, information comprising or related to the present, or prospective business or technology of the Company, CBIZ or any other Affiliated Company, trademarks, trade secrets, formulae, processes, techniques, know-how, and data, whether or not patentable, made or conceived or reduced to practice, discovered or learned by Employee, either alone or jointly with others, during the period of Employee's employment by Company (whether or not during normal working hours) that are related to or useful in the actual or anticipated business of Company, CBIZ or any Affiliated Company, or result from tasks assigned to Employee by Company or result from use of premises or equipment owned, leased, or contracted for by Company (hereinafter individually referred to as "Invention" and collectively referred to as "Inventions").

      (b)    Employee hereby agrees that Company shall have complete title to and be the sole owner of all Inventions whether or not patentable, and all patents, copyrights and other rights connected with or related to any such Inventions, and Employee shall not be entitled to any additional compensation from Company, CBIZ or any Affiliated Company for, any Invention. Employee shall assign and hereby does irrevocably assign to Company all right, title and interest in and to each such Invention and any and all related patent, copyright and other intellectual property and proprietary rights. At all times during and after the period of Employee's employment by Company, Employee shall, without any further compensation, execute, acknowledge and deliver such assignments, affidavits, documents and other instruments as the Company considers necessary or appropriate to vest all rights, titles and interests in and to the Inventions and Works to Company and Employee shall do such other acts as may be requested by Company to evidence, effectuate, register, secure, perfect and enforce Company's rights in and to such Inventions and Works.

      (c)    Employee acknowledges and agrees that all original works of authorship which are developed by Employee (solely or jointly with others) during the course of Employee's employment and which are protectable by copyright ("Works") are being created at the insistence of Company and shall constitute "works made for hire" for the Company, as that term

is defined in the United States Copyright Act (17 USCA, Sections 101 and 201).  If such laws are inapplicable or in the event that such Works, or any part thereof, do not fall within the definition of works made for hire under the United States copyright laws, Employee does and shall irrevocably assign and transfer all of Employee's right, title and interest (including, without limitation, all rights in and to the copyrights throughout the world, including the right to prepare derivative works and the right to all renewals and extensions) in any and all such Works for the full term of the copyright therein, to Company presently, or immediately upon creation of the Work, without the need for any further written agreement or compensation.

(d)     The Employee further acknowledges and agrees that all waivers, grants, assignments and transfers to the Company by the Employee: (i) are and shall be irrevocable irrespective of any claims or causes of action against or among the parties; (ii) include but are not limited to the right to claim and collect for past, present and future infringements and misappropriations; and (iii) shall be free and clear of any and all claims for royalties or other compensation except as stated in this Agreement. In order to effectuate, record, register, pursue and enforce any waivers or any rights sold, assigned or transferred to the Company by Employee, Employee grants the Company an irrevocable power of attorney, but nothing herein obligates the Company to secure, record, register, pursue, perfect, or enforce any rights referenced in this Agreement.

9.     Remedies.

(a)     Enforcement.  The Employee acknowledges that the Purchase Agreement Obligations and the Employment Agreement Obligations are reasonable and necessary to protect the legitimate interests of the Company, CBIZ and the other Affiliated Companies.  If the Employee breaches any of the provisions of Sections 5.1(b), 5.2(a), 5.2(c), 5.2(d) and 8.8 of the Purchase Agreement or of Sections 6, 7, or 8 of this Agreement, each Affiliated Company shall have the right to specifically enforce this Agreement by means of an injunction, within the Courts in the State of Ohio as provided in Section 8.8 of the Purchase Agreement and Section 14 of this Agreement, it being acknowledged by the Employee and agreed upon by the parties that any such breach will cause irreparable injury to the Affiliated Companies for which money damages alone will not provide an adequate remedy.  The rights and remedies enumerated above shall be in addition to, and not in lieu of, any other rights and remedies available to each Affiliated Company at law or in equity.

(b)     Partial Invalidity.  In the event any of the covenants and restrictions contained in the Purchase Agreement, including, without limitation, Sections 5.1(b), 5.2(a), 5.2(c), 5.2(d) and 8.8, or in this Agreement, including, without limitation, Sections 6, 7, and 8, shall be found by a court of competent jurisdiction to be invalid or unenforceable as against public policy or for any other reason, such court shall exercise its discretion to reform such covenant, rights and remedies to the end that the Employee shall be subject to those covenants and restrictions that are reasonable under the circumstances.

10.     Enforceability.  The unenforceability or invalidity of any provision of this Agreement shall not affect the enforceability or validity of the balance of the Agreement.  In the event that any such provision should be or becomes invalid for any reason, such provision shall remain effective to the maximum extent permissible, and the parties shall consult and agree on a

legally acceptable modification giving effect to the commercial objectives of the unenforceable or invalid provision, and every other provision of this Agreement shall remain in full force and effect.

11. <u>Binding Effect</u>. This Agreement shall inure to the benefit of, and be binding on the Company and CBIZ and their respective successors and assigns. The Employee acknowledges that this Agreement is a personal services agreement and cannot be assigned by the Employee, but shall inure to the benefit of, and be enforceable by, the Employee's executors, administrators and personal representatives upon the Executor's death or disability.

12. <u>Notices</u>. All notices, requests, demands and other communications made or given in connection with this Agreement shall be in writing and shall be deemed to have been duly given (a) if delivered, at the time delivered, or (b) if mailed, at the time mailed at any general or branch United States Post Office enclosed in a registered or certified postage-paid envelope, or (c) if couriered, one day after deposit with a national overnight courier, addressed to the address of the respective parties as follows:

| | |
|---|---|
| To the Company: | c/o CBIZ, Inc.<br>6050 Oak Tree Blvd. South, Suite 500<br>Cleveland, Ohio 44131<br>Phone: (216) 447-9000; Fax: (216) 447-9007<br>Attention: General Counsel |
| With a Copy to: | CBIZ, Inc.<br>6050 Oak Tree Blvd. South, Suite 500<br>Cleveland, Ohio 44131<br>Attn: General Counsel |
| To the Employee: | Greg J. Cryan<br>680 Glenover Drive<br>Alpharetta GA 30004 |

or to such other addresses as the party to whom notice is to be given may have previously furnished to the other parties in writing in the manner set forth above, provided that notices of changes of address shall only be effective upon receipt.

13. <u>Entire Agreement</u>. This Agreement constitutes the entire agreement of the parties hereto relating to the subject matter hereof, and there are no written or oral terms or representations made by either party other than those contained herein. This Agreement supersedes and replaces any and all employment agreements and agreements providing for payments for services (including, without limitation, all deferred compensation agreements, plans, or programs) between the Employee and Meridian or the Company, if any, all of which shall be terminated upon the Employee's execution of this Agreement.

14. <u>Applicable Law</u>. The validity, interpretation, construction, performance and enforcement of this Agreement shall be governed by and construed in accordance with the laws of the State of Ohio, without regard to principles of conflicts of law. Employee hereby irrevocably submits to the jurisdiction of the courts in the State of Ohio (state or federal), with

venue in Cuyahoga County, over any dispute arising out of this Agreement and agrees that all claims in respect of such dispute or proceeding shall be heard and determined in such court. Employee hereby irrevocably waives, to the fullest extent permitted by applicable law, any objection which he may have to the venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute.  Employee hereby consents to process being served by him in any suit, action or proceeding by delivering it in the manner specified by the provisions of Section 12 of this Agreement.

15. <u>Section Headings</u>. The section and other headings contained in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

16. <u>Counterparts</u>. This Agreement may be executed in multiple counterparts, each of which shall be deemed to be an original, but all of which taken together shall constitute one and the same Agreement. The signatures to this Agreement need not all be on a single copy of this Agreement, and may be facsimiles rather than originals, and shall be fully as effective as though all signatures were originals on the same copy.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the 1st day of January, 2012.

The "Company":

CBIZ INSURANCE SERVICES, INC.

By: _____

Name:  Jerome P. Grisko, Jr.

Title:  Executive Vice President

The "Employee":

_____

Gregory J. Cryan

10

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the 1st day of January, 2012.

The "Company":

CBIZ INSURANCE SERVICES, INC.

By:_____
Name: Jerome P. Grisko, Jr.
Title: Executive Vice President

The "Employee":

_____
Gregory J. Cryan

10

## EXHIBIT A
## COMPENSATION

The Employee's compensation provided for in Section 3(a) of the Employment Agreement will be:

| | |
|---|---|
| Base Salary: | $250,000 per annum, subject to increase in accordance with Company policy |
| Acquisition Referral Fee: | In accordance with the Company's Acquisition Lead Program, as in effect from time to time.  A copy of the current Acquisition Lead Program is attached hereto as **Exhibit B**. |
| Commissions: | 35% rate on New Business.  "New Business" means products, policies or services sold to New Clients within 12 months of the initial engagement of such client.  "New Clients" means any client not previously a client of the Company or Meridian.   For purposes of clarification, if the client is an entity, it shall be deemed a New Client if the entity was not previously a client even if one or more principals of the entity was previously a client. |

11

# EXHIBIT B
## ACQUISITION LEAD PROGRAM

See attached.

104023792.3

12

# Acquisition Lead Program



**Points of Contact**

Rob O'Byrne
913-234-1788
robyrne@cbiz.com

Mike Kouzelos
216-525-1919
mkouzelos@cbiz.com

Kim Dibble
216-525-1923
kdibble@cbiz.com

## Purpose of Program:

To engage CBIZ ES employees, at all levels, in new revenue growth through acquisitions.

## Program Design:

Eligible employees ("Referring Party") will be paid 25 to 50 basis points of initial revenue acquired (up to a maximum referral fee of $50,000) for closed acquisitions. See Fee Schedule attached. Amounts will be paid through payroll after close, subject to Executive approval. The expense associated with this program will be paid by Corporate and not charged to the individual business units.

Employees are encouraged to connect with your industry contacts to identify prospects interested in joining CBIZ.

## Program Qualification:

*Effective for Prospects identified on or after April 1, 2011* – Initial meetings with the key decision maker of a prospect occurring after April 1, 2011 that results in a closed acquisition.

Referring Party must have the lead role in getting CBIZ to the table to discuss an acquisition with the prospect and attend the initial meeting with the prospect's key decision maker, CBIZ executive and business unit leader.

*Eligible Employees* – All employees

## Referral Definition:

An appropriate prospect to refer is an agency or producer that serves clients in our existing service lines of Employee Benefits, P &C, RPS, HCS or Payroll.

1. The Referring Party will know the key decision maker of the prospect and identify whether the prospect has an interest in joining CBIZ.
2. The Referring Party is able to obtain a meeting with the key decision maker who has the ability to make a decision to join CBIZ.
3. There are no current or past discussions with the CBIZ M&A department or a CBIZ Executive.
4. The transaction must close within 12 months of the initial meeting.
5. One payment will be made for each closed referral. The forms are approved by the Referring Party, business unit leader and executive. In situations where multiple referrals are made for the same agency, we will look to the business unit leader to give proper credit or decide to split the referral fee if each occurred at the same time and at the appropriate decision making level.

## Qualified Lead Submission Form:

Please see the attached Acquisition Lead Program Submission Form to submit your new business growth opportunity!